FILED

U.S. Bankruptcy Appellate Panel
of the Tenth Circuit

February 20, 2015

Blaine F. Bates
Clerk

NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL

# OF THE TENTH CIRCUIT

| | |
|---|---|
| IN RE WILLIAM PHILIP WAGNER, <br><br> Debtor. | BAP No.　CO-13-043 |
| MARTIN J. WAGNER, <br><br>　　　　Plaintiff – Appellee, <br><br>　　v. <br><br> WILLIAM PHILIP WAGNER, <br><br>　　　　Defendant – Appellant. | Bankr. No.　11-10853 <br> Adv. No.　11-01233 <br> Chapter　7 <br><br> OPINION* |

Appeal from the United States Bankruptcy Court
for the District of Colorado

Before THURMAN, Chief Judge, CORNISH, and JACOBVITZ, Bankruptcy
Judges.

CORNISH, Bankruptcy Judge.

This appeal is a cautionary tale about what should be common practice but,
unfortunately, is not. Any financial agreement should be formalized by a written
document prepared by a lawyer, particularly when the agreement involves loaning
money to family or friends. In this case, failure to do just that led to a bitter
divide between a father and his son.

Debtor William Wagner, who is now known as William McDonough
("McDonough"), appeals a bankruptcy court order that both determined his debt

---

* This unpublished opinion may be cited for its persuasive value, but is not
precedential, except under the doctrines of law of the case, claim preclusion, and
issue preclusion. 10th Cir. BAP L.R. 8026-6.

to the plaintiff to be non-dischargeable and generally denied him a discharge in bankruptcy. The adversary proceeding from which this appeal arose was initiated by plaintiff Martin Wagner ("Wagner"), who is McDonough's father. The present intra-familial dispute dates back to 2004, when Wagner and McDonough agreed that McDonough would obtain a loan using Wagner's cabin in Minnesota as collateral. McDonough obtained the loan, but defaulted on it in mid-2005, and the parties' relationship has deteriorated significantly since that time.

## I.    BACKGROUND[1]

Wagner, who resides in Minnesota, is the father of six grown children. McDonough is his eldest son. Wagner worked as a project manager/consultant for Northern States Power until 1997. In 2004, he was essentially retired[2] and living in a home owned by his girlfriend, Linda. Years earlier, Wagner had inherited a cabin (the "Cabin") adjacent to Woman Lake in Minnesota from his father.[3] The Cabin had been regularly used by Wagner and his children for many years, and was considered "the family's" cabin. It was expected and intended that the Cabin would ultimately be inherited by Wagner's children. In 2004, the Cabin had an estimated value of somewhere between $600,000 and $750,000. The only lien on it at that time was in the amount of approximately $9,000. That lien arose from Wagner's agreement in 2002 to allow his daughter Christina to obtain an $11,000 loan, in order to pay off credit card debt, using the Cabin as collateral. Christina had regularly made the payments on that loan. Wagner had also previously

---

[1]    This decision does not attempt to detail the many facts that are extraneous to those relied upon by the finder of fact, although some of the omitted facts may have factored into the bankruptcy court's credibility determinations.

[2]    Wagner's only income in 2004 was from Social Security and his performances of interpretive characterizations of Mark Twain and Albert Einstein at various locations and events.

[3]    Wagner's father actually transferred the Cabin to both Wagner and his sister shortly after their mother died in 1986, but the sister's interest was transferred to Wagner approximately 5 or 6 years later.

-2-

obtained a loan on behalf of his sons Matt and Charlie for the purchase a condo in Colorado, and had also loaned money to his daughter, Anna, for school. Those loans, which were never secured by the Cabin, had also been repaid.

Several times in the years leading up to 2004, Wagner had asked his children to jointly propose a way for the Cabin to subsidize Wagner's living expenses and eliminate his Cabin-related obligations (e.g., utilities, property tax, and maintenance). Among several suggestions made by Wagner was that each child contribute a set amount per year, based on factors such as their ability to pay, their Cabin usage, and their desire to inherit the Cabin. Although Wagner sought input from his children on this matter several times, and it was periodically discussed by and between them. No "plan" was ever proposed.

In 2004, McDonough was married to Michelle Weiss, now known as Michelle Kuznia ("Kuznia"), and lived in Forest Lake, Minnesota, where he and Kuznia owned a home (the "Forest Lake home"). McDonough worked as an IT project architect and earned a salary "in six figures." At that time, McDonough and Kuznia owned a Featherlite trailer,[4] a 2003 Ford F350 truck, and a 1999 VW Jetta. The Forest Lake home carried a first mortgage of approximately $258,000, and a second mortgage of approximately $67,000. The amount of the loan underlying the second mortgage was more than $104,000, but it was only partially secured by the Forest Lake home, with the remainder secured by McDonough's and Kuznia's vehicles.

In March 2004, McDonough and Wagner discussed several life issues, including that McDonough might leave the IT field and begin a horse training business. They also discussed McDonough possibly selling his home and moving to the Cabin, as well as the potential to use the Cabin as a kind of "retreat" that

---

[4] The Featherlite trailer was a combination horse transportation device and camper-type living quarters. At various times between 2004 and 2011, McDonough lived either in that trailer or its replacement for extended periods.

would be available to both family members and the public. In June 2004, McDonough and Wagner specifically discussed using the Cabin as collateral for a $150,000 loan (the "Cabin Loan") to McDonough. The parties agreed on some terms, and McDonough obtained the Cabin Loan, in the principal amount of $194,000, shortly thereafter.

At this point, the parties' testimonies diverge significantly. Nonetheless, at least the following facts appear to be undisputed:

- Wagner and McDonough never put their "agreement" in writing;

- The Cabin Loan, which was payable over five years, closed on June 25, 2004;

- The sale of the Forest Lake home for $355,000 closed four days later, on June 29, 2004. From both the sale of the home and the closing of the Cabin Loan, McDonough and Kuznia received approximately $107,000 in cash;[5]

- McDonough and Kuznia moved to the Cabin after the Forest Lake home sold, but Kuznia left both the Cabin and McDonough in March or April 2005;

- McDonough continued to live in the Cabin after Kuznia left, and made the Cabin Loan payments through June 2005;

- McDonough's contract IT job terminated in May 2005;

- Wagner, who typically spent summers at the Cabin, went there in the summer of 2005. When he arrived at the Cabin in June, Wagner considered it to be generally in disrepair. During that summer he and McDonough had several discussions regarding the condition of the Cabin;

- In August 2005, Wagner learned that McDonough had defaulted on the Cabin Loan. McDonough and Wagner met at the Cabin and discussed the default. Their conversation turned into a heated exchange that culminated in McDonough's removal from the Cabin property by Sheriff's deputies, at Wagner's request;

- McDonough and Kuznia were divorced in October 2005;

- McDonough lived in his Featherlite trailer from August 2005 until he moved to Colorado in early 2006 to take on another IT job contract, which was only a three-month job;

---

[5]    Approximately $18,500 was proceeds from the sale of the Forest Lake home, and approximately $89,000 came from the Cabin Loan.

- In June 2006, Wagner filed a civil lawsuit against McDonough in Minnesota state court asserting breach of the Cabin Loan by default;[6]

- Shortly after moving to Colorado, McDonough met Maureen McDonough ("Maureen"). McDonough, who had been living with his brother, moved into Maureen's house in late 2006;

- In August 2007, Wagner and McDonough executed a settlement agreement to resolve the Minnesota lawsuit, under which McDonough agreed to refinance the Cabin Loan;

- McDonough did not refinance the Cabin Loan and in April 2008, pursuant to the terms of their settlement agreement, Wagner obtained a $261,000 judgment by confession against McDonough in the Minnesota lawsuit;

- Still in Colorado, McDonough obtained a job with a company called CACI in March of 2009, earning gross wages of over $10,000 per month. That contract job did not terminate until the end of March 2011;

- In February 2010, Maureen added McDonough to an account she owned at Premier Federal Credit Union (the "Premier Account"). He remained a co-owner of that account until he voluntarily relinquished ownership approximately five months later;

- In May 2010, Wagner registered his Minnesota Judgment in Colorado and, thereafter, attempted to garnish a bank account McDonough had at Great Western Bank. On June 1, 2010, when the garnishment took place, the balance in that account was approximately $6, since McDonough had previously begun depositing all of his funds into the Premier Account;

- On June 9, 2010, McDonough removed his name from the Premier Account and was thus no longer a co-owner of it. However, McDonough continued to have his wages deposited into the Premier Account for several months after his name was removed;

- On January 18, 2011, McDonough filed a Chapter 7 bankruptcy petition and a Statement of Financial Affairs ("SOFA") without revealing the Premier Account in either.

---

[6] Since Wagner's state court lawsuit was based on breach of contract, McDonough contends that the bankruptcy court fraud claim was a fiction. However, McDonough cites no authority for the proposition that a creditor who obtains a breach of contract judgment in state court is thereafter precluded from asserting in bankruptcy that its judgment against the debtor is non-dischargeable under bankruptcy law. In fact, other bankruptcy courts have allowed creditors to assert that their state court breach of contract judgments are non-dischargeable in bankruptcy. *See, e.g., Palm Fin. Corp. v. Eberts (In re Eberts)*, No. 2:11-cv-08827-MWF, 2013 WL 1248637, at *10-11 (C.D. Cal. March 27, 2013), *appeal docketed*, No. 13-55691 (9th Cir. April 25, 2013) ; *Fire Safe Prot. Servs., LP v. Ayesh (In re Ayesh)*, 465 B.R. 443, 446 (Bankr. S.D. Tex. 2011).

### A. Wagner's Version of Events

According to Wagner, McDonough told him in March 2004 that he and Kuznia wanted to move from their Forest Lake Home to the Cabin, telling him he'd rather pay what he paid on his mortgage to Wagner. Wagner's understanding was that his son wanted to use the Cabin as a rental property while he also built up a horse training business. In June 2004, McDonough asked Wagner if he could use the Cabin as security in order to obtain a $150,000 loan that he needed to consolidate debts. McDonough told Wagner he intended to sell his Forest Lake Home and he would use the equity he received from that sale to pay down the Cabin Loan by $100,000. McDonough also told Wagner his six-figure income would allow him to easily pay off the Cabin Loan within two years. Wagner agreed, partly because he had loaned money to his children, including McDonough, on various occasions in the past and had also previously allowed one of his children to use the Cabin as security for a small personal loan. All of the loans to Wagner's children had been, or were being, repaid satisfactorily.[7]

As part of his agreement to allow McDonough to use the Cabin as collateral, Wagner required that the new loan be used to pay off the balance of his daughter's secured loan, in the amount of approximately $9,000, which was the only lien on the Cabin at that time. A few days after Wagner had agreed to McDonough's proposed use of the Cabin, he received loan paperwork in the mail, which he was instructed to sign before a notary and return to the lender by overnight mail. Wagner did not read the documents, simply signed and returned them. The loan documents reflected a loan in the amount of $194,000, rather than the $150,000 amount Wagner and McDonough previously discussed. However,

---

[7]     Wagner had previously loaned money to McDonough that had not been repaid, but there was no evidence that it was an issue between them. None of the agreements Wagner made with any of his children had ever been reduced to writing.

Wagner would have agreed to the revised loan amount based on McDonough's promise to pay the Cabin Loan down by $100,000 with equity from his Forest Lake Home. When he signed the loan documents, Wagner was unaware either that a sale of McDonough's Forest Lake Home was already pending, or that it would close only four days after the Cabin Loan did.

During the summer of 2004, McDonough and Kuznia moved from Forest Lake to the Cabin. Also during that summer, they gave Wagner two checks without explanation. First, he received a check in the amount of $25,000, which had been drafted by Kuznia. Shortly thereafter, Wagner received another check, this one in the amount of $20,000, drafted by McDonough. Wagner assumed the $20,000 payment was for repayment of approximately $20,000 he had loaned to McDonough in 2002-03, during a period when McDonough was unemployed, in order to keep the Forest Lake Home out of foreclosure. Wagner considered the $25,000 to be advance rent on the Cabin. There was nothing connected with the checks that specified their purpose, and Wagner did not discuss them with McDonough or Kuznia.

In June 2005, Wagner arrived at the Cabin, intending to stay there for the summer, as was his habit. He was unhappy with the condition in which he found the Cabin, and McDonough was not living there at the time. He discussed his concerns with McDonough, who ultimately told him in August that he had defaulted on the Cabin Loan. McDonough and Wagner met in person after this news, and their discussion turned into an angry exchange. Wagner testified that McDonough came to the Cabin, sat down on a bench next to him and asked him, "If I continue making payments on the loan, what do I get?" Wagner told McDonough to "get the mortgage off the Cabin" first, and then they could talk about it. To this McDonough responded, "I got you over a barrel. You don't got any negotiating power." Wagner understood that McDonough "knew what my finances were," including that he was unable to finance the Cabin Loan himself,

and believed that McDonough "expected me to turn the property over to him." McDonough never even suggested to Wagner that he was unable to make the Cabin Loan payments, and Wagner had told him numerous times in the past that all he ever needed to do was ask if he needed help. Wagner was upset and asked McDonough to leave, but McDonough insisted that a lawyer had told him that he was a co-owner of the Cabin and refused to leave the property. At that point, Wagner called the Sheriff's Office. When the Sheriff's officers arrived, McDonough was escorted off of the property.

Subsequently, Wagner was able to refinance the Cabin Loan, first through McDonough's lender and, ultimately, with U.S. Bank. In order to obtain the U.S. Bank loan, Wagner had to add his daughter Anna to the Cabin title, something he'd never done before. By doing so, however, he was able to obtain a 30-year mortgage with an interest rate of 4.95%. In June 2006, following several failed attempts to resolve Walker's and McDonough's differences, Walker filed suit against McDonough and Kuznia in Minnesota state court, seeking $195,000 based on their failure to pay the Cabin Loan.[8] In 2007, McDonough agreed to settle the lawsuit by refinancing the Cabin Loan. He also agreed to entry of a judgment by confession against him in the event he failed to do so. McDonough did not refinance the Cabin Loan as agreed, and Wagner obtained a judgment in the amount of $261,000 against him in the Minnesota lawsuit. He registered that judgment in Colorado, where McDonough was living, in 2006. In June 2010, Wagner's attorney both attempted to garnish a bank account in McDonough's name and issued interrogatories to him, seeking information regarding his assets.

Shortly thereafter, McDonough contacted the attorney and, in the course of their conversation, told him that he'd only earned approximately $32,000 the

---

[8] Wagner also sought $24,000 in unpaid monthly rent on the Cabin, as well as $51,000 for prior loans, from McDonough only.

previous year, had no assets, and was "barely scratching by."[9]  As a result of that conversation, Wagner authorized his attorney to accept $200 monthly payments from McDonough for six months for them to hold off collection.  Although McDonough's payments were not always timely, all six were ultimately received. Wagner later learned, from a conversation with his attorney, that McDonough was actually grossing more than $10,000 per month in wages, had no secured debt, and was living in Maureen's home rent-free.

### B.     McDonough's Version of Events

According to McDonough, it was Wagner's idea to pledge the Cabin as security for a loan because "he needed the money."  McDonough "didn't need the loan at the time," as he was "well employed" and "did not have any financial issues at that point."  Moreover, he and Kuznia "did not need to sell our Forest Lake Home."  Regarding Wagner, McDonough testified that, "since 1998 he has stated that he is penniless and unemployed and on social security."  Based on a letter received from Wagner around Thanksgiving in 2003, McDonough "offered to purchase the Cabin over time and take out a loan in which I could give him the substantial down payment" of $40,000 Wagner requested.[10]  McDonough was considering getting out of the IT contracting business because of the instability of his employment, and he and Wagner discussed McDonough's interest in training horses, for which he would need a horse trailer.  However, although they "talked about me purchasing this horse trailer," McDonough could have qualified to make that purchase on his own and "did not need it wrapped into" the Cabin Loan.

---

[9]      The bankruptcy court seemed particularly unhappy with the fact that McDonough, when confronted about the falsity of those statements, "made the point that the [sic] he was not under oath" at the time, noting, "as if that is a distinction that should count in his favor."  *See Order on Plaintiff's Second Amended Complaint* ("BR Opinion") at 5, *in* App. at 848.

[10]     *Transcript of Trial held on June 26, 2012* at 68, *in* App. at 458.  On cross-examination, however, McDonough vehemently denied having ever said that the Cabin Loan was for the purchase of the Cabin.  *Id.* at 121, *in* App. at 511-13.

Since Wagner "wanted his money," his only requirements for the loan were that he receive the $40,000 "down payment" and that McDonough repay "the $5,000 amount that he gave me in 2002, 2003."

Wagner knew that McDonough intended to sell his Forest Lake Home, but McDonough never promised him he would pay down the Cabin Loan by $100,000 with equity from that sale, nor did Wagner ever demand that McDonough do so. McDonough made the Cabin Loan payments through June 2005, after which he was unable to do so because he lost his job with Talent Software Services in May, and Kuznia had "drained" their bank account when she left him.[11]  McDonough began receiving unemployment benefits immediately after his termination, because it was a "planned layoff."  He remained unemployed for about ten months, at which time, he obtained a three-month IT job in Colorado.  During his unemployment, McDonough received benefit payments, in the amount of $986 each, biweekly.[12]  McDonough testified he had only agreed to refinance the Cabin Loan in August 2007 because he didn't have the resources to contest Wagner's lawsuit.  He also testified that he knew when he agreed to refinance that he did not have the resources to do so.  However, Wagner was still threatening him with a "bogus" criminal prosecution over a van he had asked McDonough to sell, then later reported McDonough had stolen.   The prosecution severely hampered McDonough's ability to work in his field, as it requires full security clearance. Pursuant to the terms of the proposed settlement, which McDonough claims was "coerced," Wagner agreed to dismiss the criminal matter.

---

[11]     McDonough claimed Kuznia took approximately $8,000 from their joint account, while she testified she took approximately $800.  Kuznia, who testified at the trial by telephone, also stated that McDonough had told her on one occasion that he didn't intend to pay the Cabin Loan.  The probative value of her statements is tainted by the facts that she and McDonough are divorced and she was a co-obligor on the Cabin Loan.

[12]     $986 x 26 ÷ 12 = $2,136 per month.  The Cabin Loan payments were $1,163 per month.

When McDonough did not refinance the Cabin Loan, Wagner registered a Minnesota Judgment in Colorado and began collection efforts. In early June 2009, after learning that Wagner had garnished his Great Western Bank account, McDonough removed his name from Maureen's Premier Federal Credit Union account because he "didn't want Maureen's funds to be garnished in my judgment dispute." Although McDonough never had an ownership interest in the Premier Account after that time, he continued to have his wages deposited into the account until shortly before he filed his bankruptcy petition in January 2011. However, "his" funds in the Premier Account were transferred back to him prior to the filing date so, on that date, all of the funds in that account "were completely Maureen's."

In July 2010, McDonough spoke with Wagner's attorney and agreed to pay Wagner $200 per month for six months, which he did. However, in November 2010, the IRS began attempting to garnish money from McDonough's then employer, CACI, based on over $500,000 in 2000 and 2001 tax liability McDonough had incurred in connection with some previously-owned businesses. McDonough believed that his IRS debt had been "written off" in 2009.

In November 2010, McDonough purchased a 1998 Ford Ranger. On December 20, he traded in his 2003 Ford F350 truck, which he owned free and clear, for $12,000, which he put towards the purchase of a 2008 Ford F350 for approximately $45,000. On December 24, he traded in the 2000 Featherlite trailer for $19,000 towards the purchase of a new 2010 Homestead live-in trailer at 22% interest. McDonough testified that he *had* to make these purchases because he and Maureen were separating and he would need a place to live when he moved out of Maureen's home. At the time the purchases were made, McDonough knew that his contract with CACI would be ending in March 2011, but he had no choice, and he reaffirmed both debts in bankruptcy.

-11-

## II. APPELLATE JURISDICTION

This Court has jurisdiction to hear timely filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit, unless one of the parties elects to have the district court hear the appeal.[13] An order denying a debtor's discharge in bankruptcy is a final order for purposes of appeal.[14] As McDonough timely filed a notice of appeal from that judgment,[15] and neither party elected to have the appeal heard by the district court, this Court has valid appellate jurisdiction.

---

[13]      28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr. P. 8002 (*now also at* Fed. R. Bankr. P. 8005, effective Dec. 1, 2014); 10th Cir. BAP L.R. 8001-3 (*now codified at* 10th Cir. BAP L.R. 8005-1, effective December 1, 2014).

[14]      *United States Trustee v. Garland (In re Garland)*, 417 B.R. 805, 810 (10th Cir. BAP 2009) (citing *Law Office of Larry A. Henning v. Mellor (In re Mellor)*, 226 B.R. 451, 453 (D. Colo. 1998)).

[15]      McDonough timely filed a motion to extend the time to appeal on May 13, 2013, within 14 days of the bankruptcy court's initial judgment of April 30. Fed. R. Bankr. P. 8002(c)(2) (*now codified at* Fed. R. Bankr. P. 8002(d)(1)(B), effective Dec. 1, 2014). The requested extension was granted by the bankruptcy court on May 14, and the appeal deadline was extended to June 3. The extension date was within the limits allowed by former Federal Rule of Bankruptcy Procedure ("FRBP") 8002(c), as it required the notice of appeal to be filed within 21 days of the original appeal deadline of May 14. However, on May 17, McDonough filed a "Motion to Alter or Amend Judgement [sic]," purportedly pursuant to Federal Rule of Civil Procedure ("FRCP") 59(e) (made applicable to certain bankruptcy cases by FRBP 9023), which ordinarily would have extended the time to appeal automatically. Fed. R. Bankr. P. 8002(b)(2) (*now codified at* Fed. R. Bankr. P. 8002(b)(1)(B), effective Dec. 1, 2014). The bankruptcy court denied the motion under FRBP 9023, as it had been untimely filed (i.e., more than 14 days after judgment entered). Such motions must be timely to extend the appeal deadline under FRBP 8002(b). In addition, the bankruptcy court deemed the motion to be in the nature of a motion for relief pursuant to FRCP 60(b) (made applicable to certain bankruptcy cases by FRBP 9024), which it determined to be without merit. Nonetheless, the bankruptcy court did amend the judgment pursuant to FRCP 60(*a*), concluding that the language of its prior order "could be misconstrued." *Order on Motion to Alter or Amend Judgment* at 1, *in* App. at 885. An amended judgment, making clear that the bankruptcy judgment amount was "not in addition to" Wagner's state court judgment, but represented only the portion of that judgment that was non-dischargeable in bankruptcy, was entered on May 23, 2013. *Amended Judgment* at 1, *in* App. at 888. On June 3, McDonough filed a timely notice of appeal from both the initial and the amended judgment, pursuant to the previously granted extension of time to appeal as well as FRBP 8002(a), as the notice was filed within 14 days of the amended judgment.

### III. WAGNER'S MOTION TO STRIKE

In this appeal, Wagner has filed a motion to strike certain portions of McDonough's Appendix, specifically, transcripts of: 1) the § 341 meeting in this case; 2) the Rule 2004 examination of McDonough on March 15, 2011; and the deposition of McDonough taken in December 2011, along with any documents or exhibits that were admitted in those proceedings.[16] Wagner listed all three of the transcripts he now wants stricken as exhibits for trial, and provided them to the bankruptcy court, but they were neither offered nor admitted as trial exhibits.[17] On the other hand, Wagner's counsel did use at least one of the transcripts in trial cross-examination of McDonough.[18]

McDonough contends that Wagner's provision of the disputed transcripts as part of his trial exhibits made them part of the record, and also that Wagner cannot use Federal Rule of Bankruptcy Procedure 8006 ("Rule 8006") to *exclude* designated documents from the record. Relying on the following excerpt from *In re Berge*, which is not an appellate decision, McDonough asserts that Rule 8006 only provides a mechanism to *add to* the appellate record:

> Under the well-accepted rule of statutory construction stated as *expressio unius est exclusio alterius*, the express inclusion of one item of a class excludes others of the same class. The only kind of modification permitted under [Rule] 8006 would thus be addition to, and not exclusion from, the record. . . .The record in an adversary proceeding in bankruptcy presumes and in large measure relies upon, the file in the underlying case. The record on appeal, for completeness and fair presentation of the issues to the appellate body,

---

[16] Wagner also requested that paragraph 18 on page 8, and the second full paragraph on page 33, of McDonough's opening brief also be stricken. McDonough apparently agreed to these redactions prior to the filing of the motion, and those portions of the opening brief were stricken by this Court's order on June 25, 2014, which also referred the motion to strike portions of the Appendix to this panel for determination.

[17] *Exhibits for Trial* at 6-7, *in* App. at 557-58.

[18] *See, e.g., Transcript of Trial held on June 25, 2012* at 15, *in* App. at 154 (counsel references the March 2012 Rule 2004 deposition transcript during McDonough's trial testimony).

> should therefore include those items from the record of the whole case which the parties agree upon.[19]

It appears from the appellate record that the bankruptcy court probably did not consider the subject transcripts in connection with its decision. The transcripts were neither proffered nor admitted, and McDonough testified at length at trial, thereby minimizing the court's need to consider additional transcripts of his testimony. In addition, McDonough did not specify any particular reliance on the transcripts by the bankruptcy court and, indeed, does not appear to even rely on them himself. Without such reliance, the transcripts' inclusion in the appellate record is essentially irrelevant. Under these circumstances, the rationale behind Wagner's determination to exclude them from the appellate record is unclear.

In any event, the additional transcripts are not necessary to this Court's consideration of the sufficiency of the evidence presented at trial, and an appellate court does not consider evidence that is not relevant to the issues before it. Therefore, Wagner's motion to strike is denied as unnecessary.

---

[19] *Berge v. Sweet (In re Berge)*, 37 B.R. 705, 708 (Bankr. W.D. Wis. 1983). This seems to be the consensus among the relatively few cases that have directly considered the issue. *See, e.g., Pinewood Enterprises, L.C. v. Williams (In re Living Hope Sw. Med. Servs., LLC)*, No. 4:13-CV-04028, 2013 WL 6508241, at *2-3 (W.D. Ark. Dec. 12, 2013); *In re Vill. Green I GP*, No. 12-2163-STA, 2012 WL 6045880, at *2 (W.D. Tenn. Dec. 5, 2012)*; In re Schmitz*, 436 B.R. 110, 111-12 (Bankr. W.D. Wis. 2010); *Wellinger v. Borton (In re Wellinger)*, No. 07-CV-10630-DT, 2007 WL 788920, at *1-2 (E.D. Mich. Mar. 14, 2007); *In re Dow Corning Corp.*, 263 B.R. 544, 549 (Bankr. E.D. Mich. 2001). However, some courts hold that the *bankruptcy* court has the power to control the contents of the appellate record, even after it has been submitted to the appellate court. *See* discussion in *Amedisys, Inc. v. JP Morgan Chase Manhattan Bank (In re Nat'l Century Fin. Enters., Inc.)*, 334 B.R. 907, 912-16 (Bankr. S.D. Ohio 2005) (relying on Fed. R. App. P. 10(e)).

## IV. ISSUE AND STANDARD OF REVIEW

**Are the bankruptcy court's fact findings in support of its decision to deny McDonough's discharge clearly erroneous?**

"A decision whether to grant or deny a discharge [pursuant to 11 U.S.C. § 727(a)][20] is in the sound discretion of the bankruptcy court, and a bankruptcy court's denial of discharge is therefore reviewed for abuse of discretion."[21] On the other hand, an appellate court reviews a non-dischargeability ruling under § 523(a) *de novo*.[22] But an appellant's claim that the evidence is insufficient to support the bankruptcy court's legal conclusion is an issue of fact that we review for clear error.[23] An appellate court must consider evidence presented to the trial court in a light most favorable to the prevailing party, especially where the fact finder was, as here, the court rather than a jury.[24] "A finding of fact is clearly erroneous [only] if it is [either] without factual support in the record, or the appellate court, after reviewing all the evidence, is left with a definite and firm conviction that a mistake has been made."[25] Finally, the trial court's decision need only be "permissible," not "correct"[26] and, if plausible in light of the record, it is not clearly erroneous even when the reviewing court would have made a

---

[20] Unless otherwise specified, all further statutory references in this opinion will be to the Bankruptcy Code, which is Title 11 of the United States Code.

[21] *Garland*, 417 B.R. at 810 (internal citation and quotation marks omitted).

[22] *Cousatte v. Lucas (In re Lucas)*, 300 B.R. 526, 530 (10th Cir. BAP 2003) (citing *United States v. Victor*, 121 F.3d 1383, 1386 (10th Cir. 1997)).

[23] *Garland,* 417 B.R. at 810. (citing *Farmers Co-op. Ass'n v. Strunk*, 671 F.2d 391, 395 (10th Cir.1982)).

[24] *Cowles v. Dow Keith Oil & Gas, Inc.*, 752 F.2d 508, 510-11 (10th Cir. 1985) (such findings are "presumptively correct").

[25] *Id.* at 511. (internal citations and quotation marks omitted).

[26] *Bill's Coal Co. v. Bd. of Pub. Utils. of Springfield,* 887 F.2d 242, 244 (10th Cir. 1989) (quoting *Volis v. Puritan Life Ins. Co.*, 548 F.2d 895, 901 (10th Cir. 1977).

different decision.[27]  Thus, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."[28]

## V.    DISCUSSION

McDonough appeals the bankruptcy court's judgment that concluded Wagner had proven two claims against McDonough based in fraud.  First, the court determined McDonough's debt to Wagner was non-dischargeable under § 523(a)(2)(A) and, second, McDonough's bankruptcy discharge was denied under § 727(a)(4).

Section 523(a)(2) provides, in part, that a particular debt owed by a debtor is not discharged in bankruptcy when that debt is "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-- (A) false pretenses, a false representation, or actual fraud . . . ."[29]  Similarly, § 727 provides, generally, that all Chapter 7 debtors shall be granted a discharge unless one of several specific exceptions is applicable.  Subsection (a)(4)(A) of that provision, frequently called the "false oath" exception, provides that a Chapter 7 debtor's discharge may be entirely denied if "the debtor knowingly and fraudulently, in or in connection with the case--made a false oath or account."[30]  Thus, under § 727(a)(4)(A), all of a debtor's debts remain undischarged, whereas § 523(a)(2)(A) precludes discharge only of particular debts that are proven to have been fraudulently obtained.  Together, these provisions preclude discharges, either entirely or as to specific debts, where debtors have defrauded or materially misled either their creditors, the trustee in bankruptcy, or the bankruptcy court.

---

[27]    *In re Iverson*, 271 B.R. 213, No. 01-018, 2001 WL 863444, at *6 (10th Cir. BAP July 31, 2001).

[28]    *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985) (citing *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 (1949).

[29]    11 U.S.C § 523(a)(2)(A).

[30]    11 U.S.C. § 727(a)(4)(A).

A creditor asserting an exception to discharge under either of these Code provisions bears the burden of proving the elements of the exception by a preponderance of the evidence.[31] Moreover, due to bankruptcy's "fresh start" objective, exceptions to discharge are narrowly construed, and doubt is resolved in favor of the debtor.[32]

### A. Section 727(a)(4)(A) false oath

Section 727(a)(4)(A) is intended to enforce the debtor's duty to fully disclose assets and interests, and to ensure that reliable information is provided to those with an interest in administration of the debtor's estate.[33] A successful § 727(a)(4)(A) claim must establish that: 1) the debtor made a false statement under oath; 2) knowing it to be false; 3) with fraudulent intent; and 4) the statement was material.[34] A statement is considered to be "material" under § 727(a)(4)(A) if:

> it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property. Moreover, materiality is not defeated by the fact that the undisclosed property interests are determined to be without value. This is because bankruptcy is a serious matter and when one chooses to avail himself of the benefits of Chapter 7 relief he assumes certain responsibilities, the foremost being to fully disclose his assets and to cooperate fully with the trustee. As such, debtors have an uncompromising duty to disclose

---

[31] *Garland*, 417 B.R. at 810 (citing Fed. R. Bankr. P. 4005) (§ 727); *Grogan v. Garner (In re Garner)* 498 U.S. 279, 291 (1991) (§ 523).

[32] *Affordable Bail Bonds, Inc. v. Sandoval (In re Sandoval)*, 541 F.3d 997, 1001 (10th Cir. 2008) (quoting *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997)).

[33] *Sierra Chems., LLC v. Mosley (In re Mosley),* 501 B.R. 736, 742 (Bankr. D. N.M. 2013) (quoting *Manning v. Watkins (In re Watkins)*, 474 B.R. 625, 635 (Bankr. N.D. Ind. 2012)).

[34] *Id.* (quoting *Rajala v. Majors (In re Majors),* 330 B.R. 880, Nos. KS-04-093, KS-04-097, 2005 WL 2077497, at *3 (10th Cir. BAP Aug. 29, 2005)). *See also Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir. 1997) (creditor making § 727(a)(4)(A) claim must demonstrate that "debtor knowingly and fraudulently made an oath and that the oath relates to a material fact").

whatever ownership interest they hold in property, and they must disclose everything, rather than make decisions about what they deem important enough for parties in interest to know.[35]

A fraudulent omission of assets from a debtor's schedules is considered to be a "statement" under § 727(a)(4)(A).[36] In this case, Wagner claimed that McDonough omitted his interest in Maureen's Premier Account, and also misrepresented his relationship with Maureen at the time of the petition in order to claim a homestead exemption in his trailer. The latter of these claims, which was based on the proximity in time of specific facts, including, McDonough's move to the trailer, the filing of his bankruptcy petition, resumption of his relationship and living arrangements with Maureen, and application for a marriage license, was rejected by the bankruptcy court, which concluded that "[t]he weight of the evidence on this point favors [McDonough] and does not provide grounds for denial of discharge under § 727(a)(4)(A)." Thus, Wagner failed to prove that McDonough's move out of Maureen's home shortly before he filed bankruptcy was not a legitimate separation. Since Wagner did not appeal that ruling, this opinion does not address its merits.

With respect to the Premier Account, it was uncontested that McDonough was a named co-owner of the account from February to June 2010, and that his wages were regularly directly deposited into that account by his employer from February 2010 to January 2011.[37] Thus, McDonough admitted that his pay checks continued to be directly deposited into the Premier Account until well after his name was removed from it, and that the account continued to be used to pay his

---

[35] *Garland*, 417 B.R. at 814-15 (internal citations and quotation marks omitted).

[36] *Id.* at 814 (a § 727(a)(4)(A) false oath may be an "omission in the debtor's schedules . . . ." (quoting 6-27 *Collier on Bankruptcy* ¶ 727.04[1][c] (15th ed. rev. 2009))).

[37] The last of these direct deposits took place in early January 2011. McDonough filed his petition on January 18, 2011.

living expenses as well.  Significantly, McDonough's wages were deposited into the Premier Account until the month in which he filed his petition.  However, McDonough claims that, prior to the filing of his petition, Maureen repaid him the amount of his wages that were deposited into the Premier Account in January 2011.[38]  Based on this, McDonough asserts that none of his funds were in the Premier Account when he filed his petition.

The bankruptcy court found, based on the evidence at trial, that McDonough removed his name from the Premier Account in June 2010 in order to "frustrate creditor collection activity."  Specifically, the bankruptcy court  found that McDonough sought to thwart Wagner's "lawful collection efforts" of his Minnesota Judgment in Colorado, both by removing his name from the Premier Account and by misrepresenting his financial condition to Wagner's attorney.  However, both of these events took place in June and July of 2010, and § 727(a)(4)(A) specifically applies only to activity that took place "in or in connection with the [bankruptcy] case."  Therefore, in considering Wagner's § 727(a)(4)(A) claim, the bankruptcy court only considered McDonough's pre-petition activities as evidence of his general intent regarding the parties' dispute, and based the § 727(a)(4)(A) denial of discharge on McDonough's failure either to declare on his Schedule B that the funds in the Premier Account were his joint property with Maureen, or to declare the account itself under paragraph 11 of his SOFA, as a pre-petition transfer of a financial account that occurred within one year of the petition filing.[39]

---

[38]     Despite the numerous Premier Account statements included in the appellate record, it does not appear that statements for January through June of 2011 were included.  We therefore rely on McDonough's testimony regarding this fact.

[39]     Schedule B requires a debtor to "list all personal property of the debtor of whatever kind," including property "being held for the debtor by someone else. . . ." *Voluntary Petition* at 10, *in* App. at 41.  Paragraph 2 of Schedule B specifies "Checking, savings or other financial accounts . . . or shares in banks,

(continued...)

It is clear that McDonough had an ownership interest in the Premier Account until at least June 2010, when he had his name removed from it.[40] Therefore, the Premier Account should have been listed on McDonough's SOFA as a financial account that was transferred within one year preceding his bankruptcy petition. Although McDonough contends that his failure to list the Premier Account was based on a simple misunderstanding of what he was required to list, this issue was resolved against him by the bankruptcy court on the basis of credibility. Such determinations are given great deference by appellate courts.[41]

McDonough's failure to disclose the Premier Account in his bankruptcy filings is uncontested, as are the facts of his ownership and use of that account.

---

[39]     (...continued)
savings and loan . . . or credit unions . . . ." *Id.*  Similarly, Paragraph 11 of the SOFA instructs a debtor to "[l]ist all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within one year immediately preceding the commencement of this case." *Id.* at 34.

[40]     Premier is a federally regulated credit union, subject to regulation by the National Credit Union Administration, pursuant to the Federal Credit Union Act, 12 U.S.C. §§ 1751-1795k (2006).  Federal credit unions are allowed to issue joint accounts, even where one of the owners is a nonmember.  The appellate record does not disclose whether McDonough was a member of Premier, but it is clear that, as a joint owner, he effectively owned the account's entire contents, and could withdraw any or all of the funds therein. *See* NAFCU Compliance Blog, "Joint Accounts - the Double Edged Sword," (May 21, 2010) http://nafcucomplianceblog.typepad.com/nafcu_weblog/2010/05/joint-accounts-the-double-edged-sword.html.  Similarly, Colorado law allows credit unions to carry joint membership accounts, the entirety of which may be paid to any one of the joint account holders.  Colo. Rev. Stat. § 11-30-103(4) (2002).  A printed copy of the cited webpage is provided as an attachment located at the end of this decision.  The Court accepts no responsibility for, and does not endorse, any product, organization, or content at any hyperlinked site, or at any site to which that site might be linked.  The Court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the Opinion of the Court.

[41]     *Vaughn v. United States (In re Vaughn)*, 765 F.3d 1174, 1180 (10th Cir. 2014) ("Where . . . certain 'findings are based on determinations regarding the credibility of witnesses, Rule 52(a) [of the Federal Rules of Civil Procedure] demands even greater deference to the trial court's finding[s].'" (quoting *Bessemer City*, 470 U.S. at 565)). *See also* Fed. R. Civ. P. 52(a)(6), made applicable to adversary proceedings by Fed. R. Bankr. P. 7052 (appellate court must give due regard to trial court's opportunity to judge witness credibility).

Other facts that were resolved contrary to McDonough's testimony were that he: 1) exercised ownership of the Premier Account; 2) had his name removed from the account in order to protect its funds from Wagner's collection efforts; and 3) continued to keep his wages and other income in the account thereafter and to use it to pay his living expenses. The bankruptcy court was very clear regarding the findings it made that were contrary to McDonough's testimony, stating:

> The overriding impression the Court is left with after hearing the Defendant's testimony is that he is an individual who will say virtually anything the situation seems to require. Rarely, it seemed, was he capable of giving a straight answer to a simple question. . . . The result of the Court's observations of the Defendant on the witness stand and the Court's assessment of his credibility is that the Court can have no confidence in any of the Defendant's testimony. The consequence of that assessment is that, whenever other evidence contradicts the Defendant's testimony and the Defendant's credibility on a particular point is put at issue, the Court has given credence to the contradictory evidence absent other factors causing the Court to question it's [sic] veracity.[42]

Given these circumstances, this Court simply cannot conclude that the bankruptcy court's finding that McDonough "knowingly and fraudulently" omitted the Premier Account from his bankruptcy filings, was clearly erroneous.

### B.      Section 523(a)(2)(A) fraud

As are all discharge exceptions, § 523(a)(2)(A) is narrowly construed and, therefore, its application is limited to "frauds involving moral turpitude or intentional wrong."[43]   In order to except a debt from discharge under this provision, a creditor must establish the following five elements:

(1) the debtor made a false representation;

(2) the debtor made the representation with the intent to deceive the creditor;

(3) the creditor relied on the representation;

---

[42]      BR Opinion at 4-5 *in* App. at 847-48.

[43]      *DSC Nat'l Props., LLC v. Johnson (In re Johnson)*, 477 B.R. 156, 169 (10th Cir. BAP 2012) (quoting *Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir. 1986)).

-21-

(4) the creditor's reliance was justifiable; and

(5) the debtor's representation caused the creditor to sustain a loss.[44]

Notably, unlike § 727(a)(4)(A), which requires only that the false statement be "material," § 523(a)(2)(A) requires a creditor asserting a claim under it to prove that the debtor's conduct caused it to suffer a loss. There was no real dispute in this case that Wagner suffered a loss as a result of McDonough's default on the Cabin Loan.[45]

The bankruptcy court found that McDonough's statement to Wagner that he would sell his residence and use $100,000 of the equity to pay down the Cabin Loan was a false representation under § 523(a)(2)(A). The court also determined that McDonough made that statement with intent to deceive Wagner, since McDonough knew the house was already sold when he made the statement and that the sale would not generate $100,000 in equity.[46] The bankruptcy court also found that Wagner had relied on McDonough's statement, as he would not have agreed to mortgage the Cabin for more than $94,000 without McDonough's promise to pay the loan down when his house sold. Finally, the court considered Wagner's reliance to be "justifiable" because, as an owner, McDonough could be

---

[44] *Id.* at 169.

[45] McDonough did claim at trial that his siblings had made all the post-default mortgage payments. However, Wagner testified that he made all the payments, but that Anna did provide him with some financial support. Either way, Wagner's property was indebted for the entire remaining balance of the Cabin Loan after McDonough's default, even though Wagner testified, and the bankruptcy court found, that he would not have allowed the Cabin to be mortgaged for more than $94,000 without McDonough's assurance that the mortgage would be reduced by $100,000 from the sale of McDonough's Forest Lake Home. Thus, the non-dischargeability award to Wagner was measured by the $100,000 excess lien, rather than by the entire loan amount, as the court found that only the $100,000 pay down was a false representation under § 523(a)(2)(A), whereas Wagner's claim that McDonough defaulted on the Cabin Loan was a dischargeable breach of contract claim.

[46] Although McDonough and Kuznia did net approximately $107,000 from both the Forest Lake Home sale and the Cabin Loan, the extent of the equity they received on the home sale was only approximately $18,500.

-22-

relied on to state the value of his home, and because the proposed loan would be to a family member -- similar to other loans Wagner had made to his children in the past. We review the bankruptcy court's determination of justifiable reliance for clear error.[47]

The factual difficulties presented by this case are many, including that the parties' "agreement" was: 1) not witnessed by anyone but the parties to it; 2) never really even discussed with anyone else; 3) not in writing; and 4) was reached in a context that was, frankly, rife with potential for misinterpretation. Besides all that, neither party's account of the agreement is either entirely consistent or logically sound. Yet this kind of "arrangement" was essentially standard practice for the parties' family. Given all of these factors, the conflict could only be resolved on the basis of credibility of the parties to the agreement. Parsing their testimony at trial reveals many inconsistencies on both sides. Based on the transcript of the trial, it appears that neither party was particularly credible, though also not particularly incredible. This is precisely why appellate courts "must give due regard to the trial court's opportunity to judge the witnesses' credibility." Quite simply, it is nearly impossible to make a better witness credibility determination from a written transcript than from live testimony. In this case, the bankruptcy court, as the trier of fact, resolved credibility issues in favor of Wagner, rather than McDonough.

As the parties' dispute is virtually entirely fact-based, this appeal presents essentially no legal issues. Thus, McDonough can only argue that the evidence presented to the bankruptcy court is insufficient to support its findings. If the witnesses' presentational credibility were not part of the equation, this dispute could have been resolved in favor of either party. That alone makes the evidence sufficient to uphold a trial court's findings, since the fact finder's choice between

---

[47]     *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 792 (10th Cir. 2009).

two accounts, especially when made on the basis of the witnesses' credibility, cannot be reversed on appeal.[48]

## VI.    CONCLUSION

For the reasons stated herein, the bankruptcy court's fact findings are not clearly erroneous.  Therefore, the decisions 1) denying McDonough's discharge pursuant to § 727(a)(4)(A) was not an abuse of discretion, and 2) denying discharge of his debt to Wagner pursuant to § 523(a)(2)(A), was appropriate.  We therefore affirm those rulings.

---

[48]    *See Bessemer City*, 470 U.S. at 574 ("[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous") (citing *Yellow Cab*, 338 U.S. at 342)).



# THE NAFCU COMPLIANCE BLOG
## A Helping Hand for Credit Union Compliance Officers

# NATIONAL ASSOCIATION OF FEDERAL CREDIT UNIONS

*Home*   *Archives*   *Subscribe*   **NAFCU Compliance Home**   **NAFCU Compliance School**   **NAFCU Compliance Seminar**   **NAFCU Compliance GPS**

**SEARCH**

Email Me

**HOME**

Home Page

**RECENT POSTS**

A Deeper Dive into the CFPB's Proposed Amendments on Small Creditors

CFPB Proposes to Modify Small Creditor and Rural or Underserved Areas Definitions

RBC2: A Penny for Your Thoughts

Interest Rate Risk Now and a Look Ahead

Monday Morning Tidbits

IOLTAs Now, Escrows on Deck??

CFPB Issues Final Rule Amending the TILA/RESPA Final Rule

Tolerances for Fees—Current RESPA GFE Versus TILA/RESPA Loan Estimate

Just How Costly Will RBC2 Really Be?!?

Bank Teller Part of Identity Theft Fraud Scheme; BSA Blast; Regulatory Compliance School

**RECENT COMMENTS**

DJ on NCUA Issues Regulatory Alert: Qualifying Credit Unions Can Post Privacy Notices Online

DJ on December NCUA Report Discusses CUSO Rule; Introducing Nolan

Steve Van Beek on December NCUA Report Discusses CUSO Rule; Introducing Nolan

Joyce on December NCUA Report

*« IRS Form 990 and FCUs* | *Main* | *Periodic Statements under the new Reg Z »*

## May 21, 2010

# Joint Accounts - the Double Edged Sword

*Posted by Anthony Demangone*

We get a number of questions about joint accounts.  Usually, the caller wants to know if a joint account owner can do *this* or *that* on an account.  For example:

- **Can a non-member joint owner close an account?**  A 1993 NCUA legal opinion letter stated that, yes, assuming your account agreement permits it, a nonmember joint owner could withdraw all funds.  This would effectively close the account, and possibly the membership, for the member.  **Note:** that letter is no longer available on NCUA's website.  This came up quite a bit when I worked at a credit union, often during a family dispute.  Members were shocked to learn that a joint owner could drain the account.  *It is my money,* the member would say.  True.  But in a joint account, it is their money as well.

- **Can a joint owner remove another joint owner from the account?**  Look to your contract.  Usually, both account owners must agree to a change of that type. *What do you mean I can't remove him.  But I just added him so he could stop by the branch on my behalf.*  That doesn't matter.  Once a person becomes a joint owner, they are...well, a joint owner.

- **Is it true that a joint owner owns the entire account when the other joint owner dies?** It is very possible.  Most credit unions that I talk to set their accounts up to be "joint tenancies with the right of survivorship."  This means that both owners have complete access to the account's funds.  Upon the death of one joint owner, the other joint owner's right of survivorship means they now own the entire account.  Contrast this with a joint tenancy without right of survivorship.  In this case, the deceased owner's share passes on to his estate.  *You mean grandma's account goes to Jimmy!  He was simply added as a joint owner to deposit checks for her and make ATM withdrawals!*  Look at the account agreement.  Jimmy very well may own all the account funds if the account was a joint tenancy with right of survivorship.

- **Here's the classic.** *I added my son to my account so he could make withdrawals while at school.  You're telling me he could withdraw ALL THE MONEY?*  I always wanted to answer this question with: "Yes, sir.  In tens and twenties if he wanted."

All of these situations flow from the same issue.  Members don't always understand the implications of adding a joint owner to a credit union account.  Often, what they really want is a power of attorney or an authorized user.  Giving access, without ownership, while retaining the right to revoke access may be what they want.  That's where a POA can work very well.  Make sure your front-line staff understands the distinctions between regular accounts and joint accounts, and what other alternatives exist at your


Subscribe in a reader


4682 readers
BY FEEDBURNER

Enter your email address:

Delivered by FeedBurner

**LEGAL DISCLAIMER**

This website is intended to provide general compliance information in regard to the subject(s) covered. It is provided with the intent and understanding that the publisher is not engaged in the act of rendering legal, accounting or any other professional advice. The information provided in this website is not intended nor should be used as a substitute for legal advice or other expert opinions and services in specific situations. NAFCU is not responsible for the content of comments and reserves the right to delete or block comments that it finds inappropriate.

**CATEGORIES**

Accounting

ACH

ADA

Advertising

Appraisals

Arsenal

Bankruptcy

BCP

Board of Directors

BSA

Discusses CUSO Rule; Introducing Nolan

DJ on NCUA Board Meeting; Regulatory Compliance School; A Little Taste of Vienna

JiJi Bahhur on Comment Letter Talking Points for DoD's Military Lending Act Proposal; Recent Policy Changes to Military Allotment Process

DJ on Comment Letter Talking Points for DoD's Military Lending Act Proposal; Recent Policy Changes to Military Allotment Process

DJ on Why the DoD Rule Affects All Credit Unions; Mike Coleman Says Goodbye to NAFCU

Finance compliance on CFPB Releases Compliance Bulletin and Guidance for Mortgage Servicers

Eliott C. Ponte on According to the CFPB, Free Checking Means Free, No Catches... None!; Nuptial Pictures

credit union.   Here's a sample line that can come in handy for member service reps:



> *Ms.  Jones, all you need to do is to complete and return the joint owner addition card and other materials as we discussed, making sure it is signed by you and (insert name.)*  ***Keep in mind that once the joint owner is added, he/she will have immediate and complete access to all funds in the account.***

The last sentence really drives home the characteristics of a joint account.  If the member balks, that's a great time to mention the possibility of using a POA to achieve his or her goals.

Posted by NAFCU on May 21, 2010 | Permalink

Reblog (0)    Tweet    Save to del.icio.us

## TrackBack

TrackBack URL for this entry:

http://www.typepad.com/services/trackback/6a00e54ed1a2a588330133ed9ef068970b

Listed below are links to weblogs that reference Joint Accounts - the Double Edged Sword:

## Comments



1. You suggest that removing a joint owner from a joint account is a matter of what is written in the credit union's deposit contract. In fact, it is most often a matter of state law. I know this is the case in California where code sections specifically address multiple-party accounts. Further, while it is advisable to address this issue in a deposit contract, it is not a required provision and is often not addressed. In any event, if it is addressed, it must comply with state law.

2. You also suggest that using a POA or authorized user will overcome the problems inherent in the joint account scenario. However, the only problem that is overcome is the the inability to remove the other joint account holder and even in that scenario it can be overcome by the joint owner draining the account and opening a different account. The POA or authorized user is just as capable of legally draining the account as is the joint account holder. In addition, a POA is typically used to empower the holder to act on behalf of a principal who cannot himself act either because he is incapable of acting, is out of the country or some other reason. In fact, in over 33 years of practice as a lawyer at the NCUA and in representing credit unions, I have never seen a POA used solely for this purpose when the principal is capable of acting on his own. Further, in recommending the use of POA, the credit union then needs to deal with the issue of whether or not a given POA is valid under state law. In addition, members and customers will not be anxious to hire lawyers to provide POAs or even to search for free ones on the internet. Finally, it simply is not a good idea for the credit union to subject itself to potential liability for recommending any course of action to protect the member that might not turn out to be successful, particularly if it provides a template POA to the member.

I think the important point to be made is that in taking on a joint account owner, as well as in giving someone a POA or making them an authorized

Bylaws

CFPB

Checking Accounts

Cloud Computing

Colombia

Corporate Stabilization

Credit Cards

Credit Insurance

Credit union powers

CreditCardReform

Current Affairs

CUSO

Cyber Security

Debt Collection

Derivatives

DOD

Dodd-Frank

E-SIGN Act

Escrow

Fair Lending

FAQ

FCRA

Federal Reserve

FFIEC

FHA

Field of Membership

FinCen

Fixed Assets

Flood Insurance

Fraud

Free Kick

Garnishment

GPS

HELOC

HMDA/Regulation C

HOEPA

HR

Incidental Powers

Indirect Lending

Interchange

Interest Rate Risk

Investments

IRS

Lending

user, a member had better make sure that he has chosen someone he can trust because he has potentially given away the keys to the vault.

Posted by: Todd Okun | May 25, 2010 at 11:15 AM



Anthony, Sounds like a good topic to plagiarize for our newsletter. :-)

Posted by: Diane Hatcher | June 02, 2010 at 05:12 PM

The comments to this entry are closed.

Liquidity

Loan Originator Compensation

Marketing

Married Life

MBL

MDIA

Member Complaints

Merger

Meta - Blog

Mortgage Origination

Mortgage Reform - Appraisals

Mortgage Reform - Escrow

Mortgage Reform - HOEPA/High-Cost

Mortgage Reform - Loan Originators

Mortgage Reform - Qualified Mortgages

Mortgage Reform - Servicing

Mortgage Servicing

MSB

NCCO

NCUA

ODP

OFAC

On the Hill

Payday Lending

Payment Systems

Periodic Statements

Plain Writing

Preemption

Prepaid Cards

Privacy

Private Student Loans

Recordkeeping

Reg B

Reg CC

Reg D

Reg E

Reg II - Interchange

Reg M

Reg Z

RegFlex

Regulation GG

Regulatory Burden

Regulatory Compliance School